IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OAK PLAZA, LLC                :

                           :

    v.                      :   Civil Action No. DKC 22-231

                           :

DAVID T. BUCKINGHAM, et al.   :

                           :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this state law fraud case brought by the receiver for a limited liability company are the motions to dismiss by four of the Defendants, Phillip McNutt, Susan Buckingham, David Buckingham, and Richard Buckingham. (ECF Nos. 10, 17, 19, 50).[1] The issues have been briefed, and the court now rules, no hearing being necessary. Local Rule 105.6. For the reasons to be discussed, the motions to dismiss will be granted in part and denied in part.[2]

**I. Background**

This case involves the Buckingham family, their now dissolved limited liability company, Oak Plaza, LLC, and its wholly owned

---

[1] The status of the fifth Defendant, The Cardinal Trust, is unresolved. Prior to removal, Plaintiff purported to serve the Trust by serving Susan Buckingham as Trustee, but she claims that she ceased serving in that capacity prior to this litigation. No appearance has been entered on behalf of the Trust, but Plaintiff has not sought the entry of default.

[2] David Buckingham's motion to exceed page limits is also pending. (ECF No. 43). That unopposed motion will be granted.

subsidiary, Tower Oaks Boulevard, LLC.[3]   Oak Plaza is registered
in Maryland and was first organized in 2001.  (ECF No. 15-2, at
1).[4]   The membership of Oak Plaza has included each of the five
Buckingham siblings—Daniel, Thomas, David, Susan, and Richard—and
the siblings' father, John.  (ECF No. 2, at 3).  According to the
Complaint, John Buckingham also served as Oak Plaza's "sole
manager" until his death in 2012.  (ECF No. 2, at 4).  At that
point, Daniel and Thomas Buckingham became co-managers.  (ECF No.
2, at 4).  Thomas Buckingham later "ceased to be a member [and
manager] of Oak Plaza after his bankruptcy filings in 2012, 2015[,]
and 2016," making Daniel Buckingham the sole manager of Oak Plaza.
(ECF No. 2, at 4, 9).  Under Oak Plaza's operating agreement, the
manager has "full, exclusive, and complete discretion, power, and

---

[3] The Buckingham family and its various companies have been
the subject of several lawsuits in the last decade.  For more
complete discussions of Oak Plaza, Tower Oaks, and the Buckingham
family, see *Oak Plaza, LLC v. Buckingham*, No. DKC 22-0231, 2022 WL
1591404 (D.Md. May 19, 2022); *Tower Oaks Blvd., LLC v. Procida*,
219 Md.App. 376 (2014); and *121 Assocs. Ltd. P'ship v. Tower Oaks
Blvd., LLC*, Nos. 0906 and 1454, 2015 WL 7076013 (Md.App.Ct. Nov.
12, 2015).

[4] Oak Plaza's Operating Agreement was not attached to the
Complaint, but Defendants Susan Buckingham and Phillip McNutt both
attached a copy to their motions to dismiss.  A court may consider
extrinsic evidence attached to a motion to dismiss if the evidence
"was integral to and explicitly relied on in the complaint and
[if] the plaintiffs do not challenge its authenticity." *Phillips
v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  The court
will consider Oak Plaza's Operating Agreement because it is
integral to the Complaint and Plaintiff does not challenge its
authenticity.

authority . . . to manage, control, administer, and operate the business and affairs of [Oak Plaza]." (ECF No. 15-2, at 13).

Tower Oaks is Oak Plaza's wholly owned subsidiary. (ECF No. 2, at 2). Tower Oaks is registered in Virginia, and its "sole member" is Oak Plaza. (ECF No. 2, at 2). In the past, Tower Oaks owned a commercial property located at 2701 Tower Oaks Boulevard in Rockville, Maryland, and it generated rental income from that property. (ECF No. 1-6, at 83). Under its Operating Agreement, all "major decisions" of Tower Oaks—including decisions related to its "property and . . . assets"—must be approved by a "majority" of Tower Oaks' members. (ECF No. 1-6, at 66). Because Oak Plaza is the sole member of Tower Oaks and Daniel Buckingham is the sole manager of Oak Plaza, the Complaint asserts that Daniel Buckingham has exclusive control over Tower Oaks' assets. (ECF No. 2, at 9).

About a decade ago, Tower Oaks sued several defendants—including a company called Ronald Cohen Investments—in the Circuit Court for Montgomery County. *See* Docket*, Tower Oaks Blvd., LLC v. Ronald Cohen Invs., Inc. et al.*, No. 368256V (Circuit Court for Montgomery County) (the "*Cohen* case"); (ECF No. 2, at 5). According to the Complaint in this case, "Oak Plaza, through its manager Daniel Buckingham, entrusted" the Defendant Siblings—David, Richard, and Susan—to "act on behalf of" of Tower Oaks in the *Cohen* case. (ECF No. 2, at 14). Around 2014, the *Cohen* case yielded a multi-million-dollar judgment for Tower Oaks. (ECF No.

3

2, at 5).  The Complaint in this case alleges a conspiracy among the Defendant Siblings and the lawyer they hired to represent Tower Oaks in the *Cohen* case, Phillip McNutt, fraudulently to obtain a part of the *Cohen* judgment—a conspiracy that Daniel Buckingham allegedly did not discover until 2020.  (ECF No. 2, at 5-7).

In March 2017, Thomas Buckingham sued to have the Circuit Court for Montgomery County dissolve Oak Plaza, wind up its affairs, and distribute its assets.  (ECF No. 17-2, at 2-3).  Six months later, Daniel Buckingham joined the suit as a plaintiff. (ECF No. 17-6, at 1).  Mr. McNutt—who at the time was acting as attorney for Oak Plaza—moved to dismiss the case for lack of subject matter jurisdiction, but the Circuit Court denied that motion.  Docket, *Buckingham v. Oak Plaza, LLC*, No. 431544V (Circuit Court for Montgomery County).  After a trial, the Circuit Court dissolved Oak Plaza in September 2018.  *Id.;* (ECF No. 1-6, at 38). The court then appointed an auditor to investigate whether Oak Plaza had any assets to be wound up and whether Tower Oaks had assets within the court's jurisdiction.  As part of that investigation, the auditor "obtained bank records of Tower Oaks," deposed "Richard Buckingham[] and Philip J. McNutt," "obtained written discovery," and gained "[a]dditional information . . . from public records and discussions with other individuals with personal knowledge of the history of the companies."  (ECF No. 1-6, at 38-39).

4

The auditor filed a final report in June 2020. Docket, *Buckingham v. Oak Plaza, LLC*, No. 431544V (Circuit Court for Montgomery County); (ECF No. 1-6, at 38-47). He found that "the only asset of Oak Plaza . . . was its unliquidated interest in its wholly owned subsidiary, Tower Oaks . . . , and potential direct and derivative causes of action to recover . . . funds received and paid out by [Tower Oaks.]" (ECF No. 1-6, at 41). The auditor also reported that David Buckingham, Richard Buckingham, Susan Buckingham, and Mr. McNutt purportedly took Tower Oaks' share of the *Cohen* judgment and diverted the funds into their own pockets through a series of transactions between 2015 and 2019. (ECF No. 1-6, at 41-44). Thus, the auditor concluded that Oak Plaza and Tower Oaks may have causes of action against Mr. McNutt, Richard, David, and Susan Buckingham (individually and as trustee of the Cardinal Trust, which purportedly received disbursements of the *Cohen* judgment on Susan Buckingham's behalf). (ECF No. 1-6, at 41-44).

After the auditor filed his report, the Circuit Court appointed Keith J. Rosa to be "Receiver of Oak Plaza." (ECF No. 1-6, at 36). This appointment gave Mr. Rosa "full authority to wind up the affairs of Oak Plaza," "including but not limited to powers to issue subpoenas, retain experts, investigate and compromise claims . . . , [and] institute litigation." (ECF No. 1-6, at 36). In November 2021, Mr. Rosa—acting as Oak Plaza's Receiver—sued

Richard, David, and Susan Buckingham, Cardinal Trust, and Philip McNutt in the Circuit Court for Montgomery County. (ECF No. 2, at 1). The listed Plaintiff for this suit is "Oak Plaza, LLC, derivatively and on behalf of Tower Oaks Boulevard, LLC," (ECF No. 2, at 1), and the Complaint largely restates the findings made by the auditor in his report.

The complaint divides its allegations into two categories: (1) the "assignment of judgment," and (2) the "disbursement of funds." (ECF No. 2, at 13, 15, 19, 21, 24, 27, 30, 32).[5] In the "assignment of judgment" category, the Complaint alleges that, in 2015, Defendants created several assignment documents through which Tower Oaks purported to assign portions of the *Cohen* judgment to each of the Defendant Siblings. (ECF No. 2, at 5-6). These documents were signed by Richard Buckingham as "Chief Executive Officer" of Tower Oaks and David Buckingham as "General Counsel" of Tower Oaks, even though the Defendant Siblings allegedly did not hold these positions. (ECF No. 1-6, at 86-91). The assignment documents were filed in the circuit court docket for the *Cohen* case in December 2015. (ECF No. 2, at 5-6).

In the "disbursement of funds" category, the Complaint alleges that Defendants in 2017 privately signed a contract

---

[5] The relationship, if any, between the assignments and the disbursement of funds is neither articulated in the complaint nor discussed in the motion papers.

agreeing to distribute the rest of the *Cohen* judgment among themselves. (ECF No. 2, at 6-7). They then withdrew that judgment from the court registry, put it in a newly created bank account, and eventually distributed the money in three separate disbursements, which occurred in March 2017, April 2017, and January 2019. (ECF No. 2, at 6-7). Mr. McNutt also authorized payments from the account to his law firm for $66,626.53 and to a mediator for the Defendant Siblings for $7,238.00. (ECF No. 2, at 7).

The Complaint alleges 10 counts. Counts 1 and 2 raise claims of unjust enrichment and legal malpractice based on allegations related to both the assignment of judgment and the disbursement of funds. Counts 3, 4, 7, and 8 raise various fraud and conspiracy claims based solely on the "assignment of judgment" allegations. Counts 5, 6, 9, and 10 raise similar fraud and conspiracy claims based solely on the "disbursement of funds" allegations.

In January 2022, Mr. McNutt removed the case to this court on diversity jurisdiction grounds. (ECF No. 1, at 2). After ordering added briefing to address diversity jurisdiction, the court eventually concluded that "Mr. McNutt has done enough, if just barely, to satisfy the court of its jurisdiction." (ECF No. 47, at 2).

Over the last year, the parties have filed a dizzying array of confusing and overlapping papers. First, Susan Buckingham moved

to dismiss for lack of personal jurisdiction.  (ECF No. 10).
Plaintiff responded, (ECF No. 15), and Susan Buckingham replied,
(ECF No. 20).  Next, Mr. McNutt moved to dismiss, (ECF No. 17),
Plaintiff responded, (ECF No. 26), and Mr. McNutt replied, (ECF
No. 35).  David Buckingham then moved to dismiss for insufficient
service and process and for failure to state a claim.  (ECF No.
17).  Plaintiff responded, (ECF No. 29), and David Buckingham
replied (ECF No. 44).  Finally, Richard Buckingham moved to
dismiss, (ECF No. 50), and Plaintiff responded, (ECF No. 51).
While the Defendants are apparently unwilling to file joint briefs,
their papers make many overlapping arguments, and several
Defendants have adopted wholesale the dismissal arguments made by
other Defendants.  For example, Richard Buckingham's motion to
dismiss "adopt[s] the arguments set forth in the McNutt and David
Buckingham Motions, Memoranda, and their Replies." (ECF No. 50,
at 1).  Similarly, in his reply, Mr. McNutt "incorporates and
adopts the arguments contained in the reply of Susan Buckingham
and the motion [to dismiss] of David Buckingham." (ECF No. 35, at
22).

## II.  Standards of Review

When a court's power to exercise personal jurisdiction is
challenged under Fed. R. Civ. P. 12(b)(2), "the jurisdictional
question is to be resolved by the judge, with the burden on the
plaintiff ultimately to prove grounds for jurisdiction by a

preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (internal citation omitted).  If the court chooses to rule without conducting an evidentiary hearing, "the plaintiff need only make a prima facie showing of personal jurisdiction." *Id.*  All jurisdictional allegations must be construed "in the light most favorable to the plaintiff," and "the most favorable inferences" must be drawn for the existence of jurisdiction. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005).

When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept as true a complaint's well-pleaded allegations, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).  A court need not, however, accept legal conclusions couched as factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), or conclusory factual allegations devoid of any reference to actual events, *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

## III. Analysis

Defendants make arguments both for the dismissal of the entire complaint and for dismissal of specific claims.  The former will be discussed first.

A.    **Arguments for Dismissal of the Entire Complaint**

1.    **Personal Jurisdiction over Susan Buckingham**

Defendant Susan Buckingham argues that this court lacks personal jurisdiction over her because she "is domiciled in Colorado" and she claims that the Complaint "does not allege a single act or omission by [her] in Maryland." (ECF No. 10-1, at 4-5). Plaintiff argues that Ms. Buckingham consented to this court's jurisdiction by signing Oak Plaza's Operating Agreement, which contains a forum selection clause. (ECF No. 15-1, at 4-5). That clause reads:

> Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the District of Maryland or any Maryland State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

(ECF No. 15-2, at 21-22).[6]  LLC operating agreements are interpreted according to ordinary contract principles. *See Plank v. Cherneski*, 469 Md. 548, 570, 617-20 (2020).

A valid forum selection clause "may act as a waiver [of] objections to personal jurisdiction." *Consulting Eng'rs Corp. v.*

_____

[6] The Oak Plaza operating agreement was amended in 2007 without change to the forum selection clause. (*See* ECF No. 15-3, at 1-7).

10

*Geometric Ltd.*, 561 F.3d 273, 281 n.11 (4th Cir. 2009).[7]  Although an invalid forum selection clause cannot waive personal jurisdiction, *see CoStar Realty Info., Inc. v. Meissner*, 604 F.Supp.2d 757, 764 (D.Md. 2009), Ms. Buckingham does not argue that this clause is invalid.  Thus, the key issue is whether the forum selection clause applies to this suit—that is, whether this suit "involv[es] any dispute or matter arising under" the Oak Plaza Operating Agreement.  (ECF No. 15-2, at 21-22).  When properly analyzed and applied, it does.

The Supreme Court of Maryland interpreted the nearly identical contractual phrase "arising hereunder" to cover a claim where the plaintiff "relied upon the Operating Agreement to allege" that claim.  *Plank*, 469 Md. at 614-615, 619.  Because the plaintiff's argument for liability "relied []on" the terms of the operating agreement, the court held that the claim "'ar[o]se under' the contractual umbrella of the [o]perating [a]greement." *Id.* at 619.  And in interpreting the similar phrase "arising out of," the Appellate Court of Maryland likewise held that a claim "arises out of" a contract when "proof of the contract is necessary to prove the claim." *Stratakos v. Parcells*, 172 Md.App. 464, 472-73 (2007)

---

[7] *See also Structural Pres. Sys., LLC v. Andrews*, 931 F.Supp.2d 667, 671 (D.Md. 2013) ("[A] a valid forum-selection clause is capable of conferring personal jurisdiction upon a defendant."); *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements.").

(cleaned up); *see also N. Assurance Co. v. EDP Floors*, 311 Md. 217, 230 (1987) ("The words 'arising out of' must be afforded their common understanding, namely, to mean originating from, growing out of, [or] flowing from.").

Plaintiff's claims against Ms. Buckingham "arise under" the Oak Plaza operating agreement because Plaintiff "relie[s] upon the Operating Agreement to allege" those claims. *Plank*, 469 Md. at 619. Indeed, Plaintiff's claims rest on the core assertion that the Oak Plaza Operating Agreement vested Daniel Buckingham with exclusive authority over Oak Plaza, which gave him exclusive authority over Tower Oaks' assets, including the *Cohen* judgment. (ECF No. 2, at 9). Oak Plaza's Operating Agreement states that Daniel Buckingham became one of Oak Plaza's managers upon his father's death in 2012, and that this new role gave him "full, exclusive, and complete discretion, power, and authority . . . to manage, control, administer, and operate the business and affairs of [Oak Plaza] . . . and to make all decisions affecting such business and affairs." (ECF No. 15-2, at 13). That authority presumably included making decisions related to Tower Oaks' assets—after all, the Operating Agreement also states that Oak Plaza was organized "to acquire and hold all outstanding membership interests in Tower Oaks LLC . . . and to do any and all things necessary, convenient, or incidental to that purpose." (ECF No. 15-2, at 7).

Plaintiff's claim that Susan Buckingham illegally took part of the *Cohen* judgment "without authorization from Daniel Buckingham," (see ECF No. 2, at 5), "relies upon" the Oak Plaza Operating Agreement's terms. *Plank*, 469 Md. at 619. Indeed, "proof of the [Operating Agreement] is necessary to prove the claim." *Stratakos*, 172 Md.App. at 472-73. Thus, the claims against Susan Buckingham "arise under" the Operating Agreement.

Susan Buckingham argues that she is a "former" member of Oak Plaza and the clause is inapplicable. The complaint refers to her as a "former member." (ECF No. 2 at 3). Her declaration states that she "was" a member of Oak Plaza, LLC. (ECF No. 10-2, at 4). Neither party applies a date to the end of her membership. Presumably, she relies on the dissolution of Oak Plaza in September 2018 to move her from member to former member. The Operating Agreement defines "member" as "each Person signing the Agreement and any Person who subsequently is admitted as a member of the Company." (ECF No. 15-2, at 4). Susan Buckingham signed the agreement. (ECF No. 15-2, at 24). Voluntary withdrawal is not allowed, according to Section 6.2 of the Agreement. (ECF No. 15-2, at 18). It must have been the judicial dissolution of the LLC that caused all regular members to cease being members. All of the events except the final disbursal in January 2019 allegedly occurred before that date. Thus, Ms. Buckingham was a member of Oak Plaza at the time of at least some of those events. The

13

question is whether a suit brought after dissolution against a person who was a member at the time of the alleged wrong has consented to have this suit heard here.  The answer must be yes, at least for this action that is part of the winding up of the affairs of the LLC and brought by the receiver appointed in the same action in which the dissolution was declared.  Susan Buckingham's motion to dismiss for lack of personal juridiction will be denied.[8]

### 2.  Service of Process

Defendant David Buckingham argues that he was improperly served and moves to dismiss all claims against him under Fed. R. Civ. P. 12(b)(4) and 12(b)(5).  He asserts that service was invalid because (1) the service he received did not include all exhibits attached to the Complaint, and (2) the service was late.  (ECF No. 19-1, at 6).  When service is challenged, the "plaintiff bears the burden of establishing [its] validity."  *O'Meara v. Waters*, 464 F.Supp.2d 474, 476 (D.Md. 2006).

---

[8] Because the court finds that Ms. Buckingham consented to suit in this court, it need not reach the second basis for personal jurisdiction advanced by Plaintiff, that through her participation in alleged conspiracies, Ms. Buckingham "directly or by an agent . . . cause[d] tortious injury in the State by act or omission in the State."  Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(3); (ECF No. 15-1, at 6, 9).

### a.   Service of Exhibits

Under Fed. R. Civ. P. 4(c), a defendant must be served with "the summons and complaint." Fed. R. Civ. P. 10(c) states that "an exhibit to a pleading is a part of the pleading for all purposes." Thus, some courts—including the United States Court of Appeals for the Fourth Circuit in an unpublished opinion—have reasoned that the failure to serve all exhibits is a failure to serve the "complete" complaint. *Danik v. Hous. Auth.*, 396 Fed.App'x 15, 16 (4th Cir. 2010) (unpublished); *see also Sanchez-Velazquez v. Mun. of Carolina*, Civ. No. 11-1586, 2012 WL 6726475, at *3 (D.P.R. Dec. 27, 2012). "[O]ther courts," however, "have rejected this same argument offhand." *See Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F.Supp.3d 75, 124 (D.D.C. 2021) (collecting cases).

Plaintiff's Complaint includes two exhibits: (1) the Circuit Court's order appointing the Receiver, which the Complaint calls "Exhibit A," (ECF No. 1-6, at 36-37), and (2) the papers filed by the court-appointed auditor in the state court dissolution case—including both his written report and all documents he attached to that report—which the Complaint altogether calls "Exhibit B." (ECF No. 1-6, at 38-97).[9] David Buckingham asserts that he was served

---

[9] When the clerk refiled the state court complaint on the docket of this case as ECF No. 2, only the complaint itself was filed, without the exhibits. The exhibits appear attached to the Notice of Removal, ECF No. 1-6.

with the summons, the Complaint itself, and all of Exhibit A—but only *some* of Exhibit B. (ECF No. 19-1, at 6). He says that he received the first thirty pages of Exhibit B, which include the auditor's written report and the first several documents attached to that report. (ECF No. 1-6, at 38-67). He claims that he was not served with the last thirty pages of Exhibit B. (ECF No. 1-6, at 68-97). Those pages include: (1) part of Tower Oaks' original Operating Agreement and an amendment to that agreement, (ECF No. 1-6, at 68-85), (2) the 2015 assignment documents filed in the *Cohen* case docket, (ECF No. 1-6, at 86-91), (3) the Defendants' agreement to escrow the judgment funds and a document related to the bank account in which those funds were kept, (ECF No. 1-6, at 92-94), and (4) the auditor's timesheets (ECF No. 1-6, at 95-97). Plaintiff asserts that David Buckingham was served with these documents. (ECF No. 29-1, at 4).

Even if David Buckingham is right that the failure to serve part of Exhibit B violates Rule 4, service is not necessarily "invalid" every time a plaintiff fails strictly to comply with the rules. *Armco, Inc. v. Penrod-Stauffer Bldg. Sys., Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984). Rather, when a service error is a mere "technical violation" of Rule 4, service may still be valid if the defendant received "actual notice of the pendency of the action," and the error did not otherwise harm the defendant. *Id.* This "liberal" approach, *id.*, exists because the "core function" of

16

service "is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint." *Henderson v. United States*, 517 U.S. 654, 672 (1996).  Thus, because the "real purpose of service of process is to give notice to the defendant," "mere technicalities should not stand in the way of consideration of a case on its merits." *Scott v. Maryland State Dep't of Lab.*, 673 Fed.App'x 299, 304 (4th Cir. 2016) (citing, inter alia, *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 316–17 (1988); *Armco*, 733 at 1089; *Karlsson v. Rabinowitz*, 318 F.2d 666, 668 (4th Cir. 1963)).

Here, any failure to serve part of Exhibit B would not make service invalid because (1) Plaintiff's error was, at most, a mere "technical violation" of Rule 4, (2) David Buckingham received "actual notice of the pendency of the action," and (3) the service error did not otherwise harm David Buckingham.  *Armco*, 733 F.2d at 1089.

First, even if service did not strictly comply with Rule 4, the failure to serve part of Exhibit B is at most a mere "technical violation."  *Id.*  A mere technical violation occurs where the service error is a "minor . . . defect" and the service is otherwise "in substantial compliance with Rule 4."  *Scott*, 673 Fed.App'x at 306 (internal citations omitted).  By contrast, an error is "more than a mere technicality" when it involves a "substantial" departure from Rule 4's "clear" language.  *Id.* (cleaned up).  For

example, in *Armco*, the plaintiff sought to serve a corporate defendant by mail, but the defendant did not acknowledge receiving service.  733 F.2d at 1088.  At the time, the relevant part of Rule 4 stated that when a defendant failed to acknowledge mail service, the plaintiff was required to complete "personal service upon an agent of the corporate defendant."  *Id.* (citing Fed. R. Civ. P. 4(c)(2)(c)(ii)).  Without conducting the personal service required by the rule's plain text, the plaintiff instead moved for a default judgment, arguing that the defendant had failed to file a responsive pleading.  *Id.* at 1088-89.  The court held that this error was more than a mere "technical violation" because the text of the "rule itself" plainly "required . . . personal service," and the plaintiff instead chose to "ignore[]" that  "plain requirement[.]"  *Id.* at 1088-89.

Plaintiff's alleged error here is different.  Plaintiff did not blatantly "ignore" the "plain" text of the "rule itself."  *Id.* Rather, Rule 4(c) requires service of the "summons and complaint," and Plaintiff undoubtedly *did* serve the summons, Complaint, and most of the exhibits incorporated into that complaint.  While Rule 10(c) does state that an exhibit is "part of the pleading" to which it is attached, it does not explicitly state that exhibits must be served.  Indeed, federal courts do not even agree whether a failure to serve exhibits violates Rule 4 *at all*, let alone whether such an error is serious enough to rise above a mere technical

violation.  *See Doe #1*, 554 F.Supp.3d at 124 (collecting cases and discussing courts' disagreement over the issue).[10]   Given this uncertainty, and the fact that Plaintiff served the summons, Complaint, Exhibit A, and at least part of Exhibit B, Plaintiff's purported failure to serve the rest of Exhibit B is more of a mere "technical violation" or a "failure of strict compliance," *Armco*, 733 F.2d at 1089, than it is a "substantial defect," *Scott*, 673 Fed.App'x at 306.

Second, the service David Buckingham received provided him "actual notice of the pendency of the action."  *Armco*, 733 F.2d at 1089.  A defendant receives "actual notice" when he is notified about "the commencement of the action" and his "duty to defend."  *See Karlsson*, 318 F.2d at 668.   The papers served on David

---

[10] One apparent reason for this disagreement is that Rule 10(c)'s "incorporation of exhibits" is generally considered "permissive only"—that is, a plaintiff *may* attach as an exhibit to the complaint a document on which the complaint relies, but most courts do not "require[]" the plaintiff to do so.  5A Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1327 (4th ed. 2022) (collecting cases).   When a plaintiff chooses not to attach as an exhibit a document on which the complaint relies, he may serve the bare complaint without that document, and there is nothing to suggest that such service provides insufficient notice. Thus, it may not make sense to require service of such a document simply because the plaintiff took the voluntary extra step of attaching that document to the complaint during filing.   Indeed, at least one court in the Fourth Circuit has noted that, "under federal law, there is no requirement that a plaintiff must attach the [document] he or she is suing upon," and thus the plaintiff is not required to serve that document, even when he *does* choose to "attach[] [it] as an exhibit to his complaint." *Delwood Equip. & Fabrication Co. v. Matec in Am.*, No. 2:16-cv-01843, 2017 WL 190096, at *2 (S.D.W.Va. Jan. 17, 2017).

Buckingham no doubt provided such notice.  The summons he received states that "[a] lawsuit has been filed against you," explains that he has "21 days" to "serve on the plaintiff an answer," and provides the address at which the answer should be served.  (ECF No. 19-4, at 2).  He was also served with the Complaint itself—which spans thirty-five pages and details Plaintiff's claims.  (ECF No. 19-4, at 4-38).  More still, he received the auditor's report, which contains even *more* factual detail about the case.  (ECF No. 19-4, at 92-100).  All told, it is not as if David Buckingham was left "without clear notice of the necessity to respond."  *Armco*, 733 F.2d at 1089.  He received actual notice.

Third, David Buckingham was not harmed by being served an incomplete copy of Exhibit B.  First, it is likely that he is independently familiar with nearly all of the purportedly unserved documents anyway.  He admits he has access to the 2015 assignment documents, (ECF No. 44, at 18), and he even attached those documents to his motion to dismiss, (ECF No. 19-5).  He also signed the escrow agreement himself.  (ECF No. 1-6, at 93).  And the Tower Oaks Operating Agreement was recently the subject of an intra-family Maryland state court lawsuit.  *See Tower Oaks Blvd., LLC v. Procida*, 219 Md.App. 376 (2014).  In that case, David Buckingham—who handled the matter on behalf of Tower Oaks—unsuccessfully sought to persuade the Maryland Appellate Court that the "Operating Agreements for Tower Oaks and Oak Plaza" gave him power to act as

manager for both LLCs.  *Tower Oaks Blvd., LLC v. Procida*, 219
Md.App. 376, 395-404 (2014).  Given that history, it is unlikely
that David Buckingham does not already know what the Tower Oaks
Operating Agreement contains.  It seems that the only unserved
document with which he is unfamiliar is the auditor's timesheet,
which is irrelevant here.

And if there are parts of Exhibit B with which he was not
independently familiar, the relevant portions of the unserved
documents are extensively summarized in the auditor's report—
which, again, he received in full.  That report detailed—and even
quoted from—the relevant parts of the Tower Oaks Operating
Agreement and described the contents of the 2015 assignment
documents, the escrow agreement, and the bank account form.  (ECF
No. 19-4, at 92-100).  Thus, the failure to serve part of Exhibit
B did not deprive David of a "fair opportunity to answer the
complaint," *Henderson*, 517 U.S. at 672, because all relevant parts
of those documents were described in the papers he *was* served.

Finally, David Buckingham could have accessed the unserved
documents through public court records, including in this court.
The Complaint notes that "Exhibit B" contains the papers the court-
appointed auditor filed in the public docket for the "Dissolution
Case" in the Circuit Court for Montgomery County.  (ECF No. 2, at
4).  David Buckingham himself notes that "the Maryland Case Search
Website" may be used to "check the docket entries" in the Circuit

Court. (ECF No. 44, at 21).  And to support his arguments, he
relied on dozens of documents he obtained from the dockets of prior
lawsuits in the Circuit Court; he even attached to his briefs
several screenshots of the Circuit Court's "docket entries." (ECF
No. 19-5 ("Docket Entries in *Cohen* Lawsuit")); (ECF No. 44-2, at
123-128 (docket entries in another intra-family Circuit Court
lawsuit)).  If David Buckingham could access *those* dockets, he
could access the docket for the dissolution case, where he would
have found Exhibit B in its entirety. *See LifeScience Techs., LLC
v. Mercy Health*, --- F.Supp.3d ----, No. 4:21CV01279, 2022 WL
4547002, at *9 (E.D.Mo. Sep. 29, 2022) (unserved exhibits did not
make service invalid because the exhibits were accessible "on the
public docket").[11]

In a similar case, the United States District Court for the
District of Columbia held that a plaintiff's harmless failure to
serve exhibits did not invalidate service. *See Doe #1*, 554
F.Supp.3d at 124.  In that case, the defendant argued that service
was invalid "because the exhibits were not attached" to the

---

[11] *See also Livingston v. Coleman*, No. 16-62674-CIV, 2020 WL
4669839, at *4 (S.D.Fla. Aug. 12, 2020) (unserved exhibits did not
make service invalid in part because "all exhibits . . . are
contained on CM/ECF and have been available to [the defendant]
since this case was filed"); *Sweeney v. Darricarrere*, No. 09-cv-
00266, 2009 WL 2132696, at *5 (D.Ariz. 2009) (unserved exhibits
did not make service invalid in part because "the exhibits were
filed in the Court's electronic filing system, from which the
defendants may retrieve them at any time").

complaint when it was served.  *Id.*  The court rejected that argument.  It held that service was valid in part because the defendant "acknowledge[d] that he was served with an otherwise complete copy of the . . . complaint," and the complaint was thorough enough to "provide[] ample notice to [the defendant] of the allegations against him, even without the exhibits attached." *Id.*  The same reasoning applies here.[12]

Finally, David Buckingham's reliance on *Danik v. Hous. Auth.*, 396 Fed.App'x 15 (4th Cir. 2010), is misplaced.  In that unpublished per curiam opinion, the Fourth Circuit reasoned that "all exhibits [the plaintiff] attached when she filed her complaint are part of that pleading."  *Id.*  But it did not hold that service is always improper when a plaintiff fails to serve every last page of every last exhibit.  Rather, it merely found that a district court did

---

[12] Several other federal courts have also held that a harmless failure to serve exhibits does not render service improper.  *See Livingston*, 2020 WL 4669839, at *4 (holding that the failure to serve exhibits "is merely a technical error" because service of the complaint alone "alerted [the defendant] that a suit was being filed against him . . . and upon what grounds," and the defendant "was not prejudiced by the . . . missing exhibits"); *Sweeney*, 2009 WL 2132696, at *5 ("Because the purpose of Rule 4 is to ensure that defendants have adequate notice of all claims, common sense would suggest that possessing a full copy of the Complaint satisfies this requirement, regardless of the source from which the defendants obtained any attached exhibits."); *Delwood*, 2017 WL 190096, at *2 (holding that service was valid even though the defendant was not served with "a copy of the Agreement referenced in the Complaint and purportedly attached as an exhibit" in part because "under federal law, . . . a plaintiff [need not] attach the contract he or she is suing upon . . . to the Complaint when it [i]s initially served").

not abuse its discretion in dismissing a case for improper service where the plaintiff served "only the complaint, without the appended materials or summons." *Id.* at 16.  That a district court has the discretion to find service invalid in such a case does not mean that service is always invalid when exhibits are not served.

What is more, in reaching that conclusion, the court did not even consider the "liberal" standard that governs harmless "technical violation[s]" where "actual notice" has been provided. *Armco*, 733 F.2d at 1089.  Perhaps such analysis was unnecessary because—unlike here—the plaintiff in *Danik* failed not only to serve exhibits, but the summons as well.  That error likely *does* deprive a defendant of "actual notice of the commencement of the action and the duty to defend," *see Karlsson*, 318 F.2d at 668—indeed, it is the "printed summons" that generally "inform[s] the defendant" about its "responsive pleading" deadline and the "necessity to respond."  *Armco*, 733 F.2d at 1088-89.  The Fourth Circuit has warned that a district court commits "error" by relying too heavily on "unpublished opinions," *see United States v. Hall*, 858 F.3d 254, 283 (4th Cir. 2017), and the court will not put undue weight on *Danik* here.

### b.   Timely Service

David Buckingham argues that service was untimely under Local Rule 103.8, which requires a plaintiff to serve a defendant "within ninety days of filing the pleading."  Fed. R. Civ. P. 4(m) includes

the same 90-day limit.  He argues service was untimely because he was served on March 10, 2022, which was 111 days after Plaintiff filed the Complaint in state court on November 19, 2021.  When a case is removed from state court, however, the "Rule 4(m) time period starts to run upon removal to the federal district court, not the date the action was originated in state court." 4B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1137 (4th ed. 2022).  Here, the case was removed on January 31, 2022.  David Buckingham's March 10 service was fewer than 90 days later.

David Buckingham's only response is that Local Rule 103.8 is "more restrictive" than Rule 4(m); he believes that when a case is removed to this court, Local Rule 103.8's 90-day period runs from the date the complaint is filed in state court, not the date of removal.  (ECF No. 44, at 7).  To the contrary, Rule 103.8 implements the 90-day service period provided in Rule 4(m) which begins when a case reaches "*this* [c]ourt"—that is, on the date of removal.  *See, e.g.*, *Willett v. Toyota Motor North America, Inc.*, No. TDC-21-0988, 2022 WL 17254271, at *1 (D.Md. July 12, 2022) (emphasis added) (noting that because the case was removed on April 21, 2021, the 90-day service period expired ninety days later, on July 21, 2021).  Under both the local rules and the federal rules, service was timely.

25

### 3.   Lawfulness of Oak Plaza's Dissolution

Mr. McNutt moves to dismiss for lack of standing on the apparent ground that the Circuit Court lacked jurisdiction to dissolve Oak Plaza or appoint the Receiver.  As discussed in the court's prior memorandum opinion, these arguments raise a question of capacity to sue, rather than one of standing.  Mr. McNutt asserts that the dissolution suit was a "derivative action" under Md. Code. Ann., Corps. & Assns. § 4A-801.  That provision allows a person representing an LLC's interests to sue on the LLC's behalf.  Mr. McNutt argues that "Thomas Buckingham was not a member of Oak Plaza" when he sued to dissolve Oak Plaza and, as a result, that suit "is a nullity."  (ECF No. 17-1, ¶ 63).  He also argues that "the late appearance of Daniel [Buckingham], almost 6 months after the . . . litigation was filed," did not cure the Circuit Court's initial lack of jurisdiction.  *Id.*

Plaintiff aptly notes that Mr. McNutt's argument amounts to a collateral attack on the orders of the Circuit Court for Montgomery County dissolving Oak Plaza and appointing the Receiver.  (ECF No. 26-1, at 13, 14).  Plaintiff also challenges Mr. McNutt's characterization of the state court litigation.

This court does not have the authority to overturn a facially valid order of the state court appointing Mr. Rosa as receiver.  In a similar context years ago, the Fifth Circuit explained that the ability to consider the capacity to serve in a representative

capacity does not extend to questioning the underlying appointment

by another court:

> Contrary to defendants' claim, Fed.R.Civ.P. 17(b) did not authorize the federal district court to examine whether the chancery court erred in appointing Mary Rives trustee. Rule 17(b) authorizes district courts to determine the capacity of an individual acting in a representative capacity to bring a particular suit.

> Thus, in the instant case, Rule 17(b) authorized an inquiry into whether (1) a Mississippi state court had appointed Mary Rives trustee, and (2) whether as trustee she was authorized by law to bring this action. Rule 17(b) did not authorize an otherwise impermissible collateral attack on the state court decree appointing Rives trustee. *Cf. Danos v. Waterford Oil Co.*, 266 F.2d 76, 77–78 (5ᵗʰ Cir. 1959) ("the defendants' motion is not a collateral attack on the appointment of the administrator but goes only to his capacity to sue."); *Atchison, Topeka & Santa Fe Railway Co. v. Preston*, 257 F.2d 933, 935 (10ᵗʰ Cir. 1958) (right of administratrix to maintain action not subject to challenge on collateral ground of failure to adhere to state oath requirements). Consequently, Rule 17(b) did not authorize the district court to inquire into whether the decree was correct as a matter of Mississippi law.

*Rives v. Franklin Life Ins. Co.*, 792 F.2d 1324, 1329 (5ᵗʰ Cir. 1986).

### 4.   Derivative Suit Preconditions

Defendants argue that the suit should be dismissed because

Plaintiff did not satisfy the conditions precedent for bringing a

derivative suit under Virginia law.[13]  As relevant, Virginia law

---

[13] Virginia law is relevant because Tower Oaks is organized in Virginia.  (ECF No. 1-6, at 49).  A federal court sitting in diversity applies the choice-of-law rules of the forum state, and "Maryland courts follow the 'internal affairs doctrine,' which requires application of the law of the state of incorporation to

states that "[n]o member may commence a derivative proceeding until
. . . [a] written demand has been made on the limited liability
company to take suitable action."  Va. Code Ann. § 13.1-1042.  Oak
Plaza claims to sue "derivatively on behalf of" Tower Oaks, (ECF
No. 2, at 1), but it made no such demand on Tower Oaks.  Thus,
Defendants argue, the Complaint must be dismissed.

However, it is unclear whether Virginia's written demand rule
applies to this situation.  The rule applies to a plaintiff who
"commences a derivative proceeding" on behalf of an LLC of which
the plaintiff is a "member," and Oak Plaza is a member of Tower
Oaks.  Under the Virginia law pleading requirement accompanying
the written demand rule, a plaintiff must allege that it sought
"to secure commencement of the [desired] action *by a member or
manager with the authority*" to bring that action.  Va. Code Ann.
§ 13.1-1044 (emphasis added).  Thus, Virginia law contemplates a
written demand being made upon an actor within the LLC that has

matters 'peculiar to the relationships among or between the
corporation and its current officers, directors, and
shareholders.'"  *Arkansas Nursing Home Acquisition, LLC v. CFG
Cmty. Bank*, 460 F.Supp.3d 621, 643 (D.Md. 2020) (quoting *NAACP v.
Golding*, 342 Md. 663, 673 (1996)).  This rule "also applies to
matters governing the internal affairs of LLCs."  *Id.*  Thus, a
court in this district sitting in diversity and presiding over a
derivative suit on behalf of a corporation or LLC applies the law
of the state in which that corporation or LLC was organized or
incorporated. *See, e.g.*, *Arkansas Nursing Home*, F.Supp.3d at 643
(suit on behalf of Delaware LLC, applying Delaware law); *In re
AGNC Inv. Corp.*, TDC-16-3215, 2018 WL 3239476, at *6 (D.Md. July
3, 2018) (suit on behalf of Delaware corporation, applying Delaware
law).

"the authority" to "commence[]" the desired action, presumably by a member who lacks that authority. *See Davis v. MKR Dev., LLC*, 295 Va. 488, 494 (2018) (holding that the substantive written demand requirement in § 13.1-1042 must be interpreted in a way that fits the "pleading requirements" in § 13.1-1044).  No other reading makes sense.  If the plaintiff already has the authority to force the suit in the LLC's name—for instance, if, as here, the plaintiff is the only decisionmaker at the LLC—a formal written demand serves no purpose.  Indeed, there is no other decisionmaker within the LLC who can even receive the demand.

Under the facts alleged, Oak Plaza is the "sole member" of Tower Oaks and the only party that can make decisions for Tower Oaks.  (ECF No. 2, at 9).  Tower Oaks has no board of directors and no other officers.  Thus, there is no entity within Tower Oaks "with the authority" to commence this suit—except, of course, Oak Plaza itself.  Requiring a written demand would thus nonsensically require Oak Plaza to make a demand on itself.  No Defendant has cited any cases in Virginia or elsewhere in which a parent suing on behalf of a wholly owned subsidiary with no independent decisionmakers was forced to make a written demand on that subsidiary.  And courts interpreting the analogous written demand laws of other states have held that such a demand is not required. *See In re Merrill Lynch & Co., Inc., Securities, Derivative and ERISA Litigation*, 773 F.Supp.2d 330, 338-39 (S.D.N.Y. 2011) (where

a "parent corporation . . . [has] 100 percent control" over its subsidiary, "there is no basis in law or logic" to require that a written demand be served on the subsidiary) (internal quotations omitted).[14]

### 5.  Statute of Limitations

The statute of limitations is an affirmative defense, with the burden on a defendant both to plead and to prove it. Ordinarily, a Rule 12(b)(6) motion, which tests the sufficiency of the complaint, is not the proper mechanism for reaching the merits of such a defense.  Nevertheless, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint [or are ascertainable by reference to documents properly considered], the defense may be reached on" a motion to dismiss.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

In Maryland, the default statute of limitations for civil claims—including all the claims raised by Plaintiff—is three years.  Md. Code Ann., Cts. & Jud.Proc. § 5-101.  The limitations

---

[14] *See also In re Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation*, 763 F.Supp.2d 423, 540–41 (S.D.N.Y. 2011) (same); *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1205 (Del.Ch. 2010) ("Because the parent corporation determines, through its 100 percent control, whether or not the subsidiary will sue," requiring a written demand to be served on the subsidiary would nonsensically "treat the parent corporation as if it were a minority shareholder.") (internal quotations omitted).

period begins to accrue when the plaintiff has "inquiry notice"—
that is, when (1) the cause of action "comes into existence," and
(2) the plaintiff "acquires knowledge" that would cause a
reasonable person "to make [an] inquiry" that would reveal the
alleged wrong. *Lumsden v. Design Tech Builders, Inc.*, 358 Md.
435, 447 (2000) (internal quotation omitted). By contrast, mere
"constructive notice" is not enough to trigger accrual—thus,
knowledge that is "presumed as a matter of law" is by itself
insufficient. *See Windesheim v. Larocca*, 443 Md. 312, 327 (2015).
Rather, the limitations period only runs after the plaintiff has
*actually* "acquire[d]" the knowledge necessary to put it on inquiry
notice. *Lumsden*, 358 Md. at 447.[15]

When the plaintiff is a corporation, accrual is triggered
when one of its agents "acquire[s]" the knowledge necessary to put
that agent on inquiry notice, unless the agent's interests are
"adverse" to the corporation. *Martin Marietta Corp. v. Gould,
Inc.*, 70 F.3d 768, 773 (4th Cir. 1995) (applying Maryland
law). This rule exists because a non-adverse agent is expected to
"communicate to his principal the facts that the agent acquires
while acting in the scope of the agency relationship." *Id.* (citing

---

[15] *See also Poffenberger v. Risser*, 290 Md. 631, 637 (1981)
(accrual is triggered when the plaintiff acquires "knowledge of
circumstances which ought to have put a person of ordinary prudence
on inquiry" if such an inquiry "would in all probability have
disclosed" the facts giving rise to the cause of action).

1 West's Maryland Law Encyclopedia, *Agents and Factors* § 111 (1960)). Thus, the corporation "is chargeable with the knowledge the [non-adverse] agent has acquired, whether the agent communicates it or not." *Id.*

Applying those principles here, the limitations period began to accrue when Oak Plaza was put on inquiry notice—that is, when one of its non-adverse agents "acquire[d] knowledge" that would cause a reasonable person "to make [an] inquiry" that would reveal Defendants' alleged wrongs. *Lumsden*, 358 Md. at 447. Under the Maryland Limited Liability Company Act, "each member" of an LLC "is an agent of the [LLC] for the purpose of its business." Md. Code Ann., Corps. & Ass'ns § 4A-401(a)(1). Of course, the Defendant Siblings were members of Oak Plaza, and they knew about the alleged fraud because they perpetrated it; but their interests were certainly adverse to the company, so their knowledge does not count. The only other people who were members of Oak Plaza during the events of this case were the two non-defendant siblings: Daniel and Thomas Buckingham. Thus, the limitations period began to accrue when either Daniel Buckingham (at any time) or Thomas Buckingham (at a time before he declared bankruptcy and lost his membership status) acquired sufficient knowledge to create inquiry notice.[16]

---

[16] The Maryland LLC Act also states that an LLC member is not an agent if the LLC's operating agreement says otherwise. *See* Md.

Oak Plaza alleges that "through its manager Daniel Buckingham, [it] entrusted" the Defendant Siblings "to act on behalf of" Tower Oaks in the *Cohen* litigation.  (ECF No. 2, at 14).  It also asserts that the Defendants' wrongs only "came to light" after the auditor filed his report in June 2020.  (ECF No. 26-1, at 13).  Thus, Oak Plaza argues that the limitations period did not accrue until June 2020—a little more than one year before it filed the Complaint.  Defendants make two primary arguments for why at least some claims began to accrue before 2020.  First, they argue that some claims began to accrue in December 2015, when the assignment documents were filed in the *Cohen* case.  (ECF No. 17-1, at 24).  Second, they argue that some claims began to accrue in 2017, when Daniel and Thomas Buckingham sued to dissolve Oak Plaza.  (ECF No. 17-1, at 31-32).

Neither the complaint nor the judicially noticeable documents plainly reveal that Oak Plaza had inquiry notice in 2015.  It is true that the assignment documents were filed in the *Cohen* docket

---

Code Ann., Corps. & Ass'ns § 4A-402(a)(1). And in a previous lawsuit involving this family, the Appellate Court of Maryland found that "[t]he Oak Plaza Operating Agreement in fact provides otherwise . . . [by] stating that no Member is an agent of the company." *Tower Oaks Blvd., LLC v. Procida*, 219 Md.App. 376, 406-407 (2014).  Thus, the court found that—as of 2014—the only agents of Oak Plaza were Daniel and Thomas, who at the time were Oak Plaza's co-managers. *Id.*  Thus, the result is the same: The knowledge of the Defendant Siblings is irrelevant for statute of limitations purposes, and inquiry notice is determined by the knowledge of Daniel (and perhaps Thomas, if he acquired the knowledge before he lost his status as member and co-manager).

in December of that year, but they were filed by Tower Oaks, not Oak Plaza—and Plaintiff alleges that Daniel Buckingham authorized the Defendant Siblings to act on behalf of Tower Oaks in the *Cohen* case.   The assignments themselves were signed by two of the Defendant Siblings: Richard and David Buckingham, who listed themselves as the "Chief Executive Officer" and "General Counsel" of Tower Oaks, (ECF No. 1-6, at 86-92), even though they allegedly did not hold these positions.  (ECF No. 2, at 5).  And nothing in the Complaint suggests that Daniel Buckingham or Oak Plaza hired the attorney who filed the assignments, Christopher Fogelman. Thus, based on the facts alleged, it is far from established that Daniel or Thomas Buckingham knew about the assignments in 2015.

And while Defendants argue that Daniel Buckingham should be legally "charged with knowledge" of the assignments because, as Oak Plaza's manager, he had a "duty to be aware of all of the . . . filings . . . in the *Cohen* litigation," (ECF No. 17-1, at 24-25), that argument misunderstands how inquiry notice works.  Under Maryland law, a "strictly legal presumption[]" about a person's knowledge cannot by itself trigger accrual.  *Poffenberger*, 290 Md. at 637 (internal citation omitted).  Rather, the limitations period begins only when the plaintiff *actually* "possesse[s] knowledge" that would lead to an inquiry.  *Id.* at 638.  And based on the facts alleged, it is unclear what knowledge Daniel Buckingham actually possessed in December 2015.  *See Rounds v.*

*Maryland–Nat. Cap. Park and Plan. Com'n*, 441 Md. 621, 658 (2015) ("[W]here it is unclear from the . . . Complaint what [the plaintiffs] knew and when they knew it, the question of accrual rests on a determination of fact," and a motion to dismiss cannot be granted).

The situation is different, however, later and Oak Plaza *did* have inquiry notice in 2017, when Daniel and Thomas Buckingham sued to dissolve Oak Plaza.  In mid-September 2017, Daniel and Thomas Buckingham filed an amended "complaint for dissolution" against Oak Plaza, in which they asked the Circuit Court to "[o]rder the distribution of [Oak Plaza's] assets."  ECF No. 17-6).  A reasonable manager of an LLC who has asked a court to distribute the LLC's assets would presumably investigate those assets.  Thus, a reasonable manager in Daniel Buckingham's position in 2017 would have explored Oak Plaza's assets—including the multi-million-dollar judgment Tower Oaks won in the *Cohen* case.  And any reasonable investigation into that judgment in 2017 would have at least revealed the publicly filed assignment documents.  Yet Oak Plaza did not sue until 2021.

In similar cases, several courts have held that a plaintiff has inquiry notice when it does something that gives it a reason to investigate public records, and those records would reveal the defendant's alleged wrongs.  For example, in *Cain v. Midland Funding, LLC*, 475 Md. 4 (2021), a debtor claimed that a collection

agency had illegally collected a payment from her even though it was not licensed to collect debt in Maryland. *Id.* at 31. The debtor first paid the agency in 2009, but she did not sue until 2015. *Id.* The Supreme Court held that the claim accrued when the debtor paid in 2009 because the payment gave the debtor a reason to investigate the agency's license status, and she "had the ability to ascertain, through due diligence and based upon matters of public record, whether [the agency] was licensed at the time." *Id.* at 36. Similarly, the 2017 dissolution suit gave Daniel Buckingham reason to investigate Oak Plaza's assets and put him on inquiry notice of any relevant information he "had the ability to ascertain, through due diligence and based upon matters of public record," including the 2015 assignment documents.[17]

Counts 3, 4, 7, and 8 rest entirely on allegations related to the 2015 assignments. Because Oak Plaza had inquiry notice about the assignments in 2017—but did not sue until 2021—those counts are barred by the three-year statute of limitations. Additionally,

---

[17] *See also Ruth v. Unifund CCR Partners*, 604 F.3d 908, 910 (6th Cir. 2010) (holding that, while "the mere availability of open and readily accessible public records may not suffice by itself" to trigger inquiry notice, a plaintiff is on inquiry notice of any publicly available information once it "has a reason to investigate [that] publicly available information"); *cf. Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 555 (4th Cir. 2019) (holding that a plaintiff was not on inquiry notice of information in public "legal filings" in part because the record was "devoid of any reason" for the plaintiff "to look at th[o]se [filings]") (internal citations omitted).

the parts of Counts 1 and 2 that relate to the assignments are also time-barred.[18]

There are, however, other claims that survive this time bar.  Counts 5, 6, 9, 10, and parts of Counts 1 and 2 rest on the allegation that Defendants in 2017 privately contracted fraudulently to obtain a part of the *Cohen* judgment, withdrew that money from the court registry, moved it to a Virginia bank account, and eventually distributed it among themselves in three separate disbursements, which occurred in March 2017, April 2017, and

---

[18] The court can consider the dissolution suit complaints in deciding this motion to dismiss because they are publicly available, their authenticity is not disputed, and the entire state court dissolution suit is integral to the complaint.  *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).  Indeed, it was in that suit that the Receiver was appointed and the auditor filed the report on which Oak Plaza's allegations largely rest.  (ECF No. 2, at 2).  *See, e.g.*, *McCray v. Md. Dep't of Transp.*, No. ELH-11-3732, 2014 WL 4660793, at *11 (D.Md. Sept. 16, 2014) (reviewing a document not attached to the complaint in deciding statute of limitations at motion-to-dismiss stage because the document was "integral to the complaint and authentic"); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425-26 (2d Cir. 2008) (district court properly considered "state court complaints" in deciding whether those complaints were "adequate to trigger inquiry notice" for statute of limitations purposes at the motion-to-dismiss stage, even though the state court complaints were not "cited or referred to in the [federal court] Complaint"); *Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012) (taking judicial notice of proceedings in an "earlier state-court litigation" when considering a statute of limitations defense at motion-to-dismiss stage because the proceedings were "readily ascertainable from the public court record and not subject to reasonable dispute"); *Arbogast v. Kansas*, 752 F. App'x 582, 584 n.1 (10th Cir. 2018) (same).

January 2019.  (ECF No. 2, at 6-12, 21-24, 30-35).  Oak Plaza's 2017 inquiry notice applies only to the information that a reasonable investigation at the time "would in all probability have disclosed." *Poffenberger*, 290 Md. at 637 (internal citations omitted).  Had Daniel conducted a reasonable investigation in 2017, he may have found that the circuit court had released the money from its registry, but it is unclear how he could have found the Defendants' private contract or their newly created bank account.  Nor did he have a way to discover the disbursements themselves—one of which did not occur until 2019 anyway.  Thus, Defendants have not shown that the statute of limitations bars Counts 5, 6, 9, 10, and the parts of Counts 1 and 2 that do not relate to the 2015 assignment documents.

### 6.  Whether Daniel Buckingham's Approval Was Needed

All of Plaintiff's claims rest on the assertion that the Defendants had to obtain Daniel Buckingham's approval before taking the *Cohen* judgment funds.  In response, Defendants raise several arguments to show that they were not actually required to obtain Daniel Buckingham's approval and thus that the entire Complaint should be dismissed.

First, David Buckingham argues that Defendants did not need to obtain Daniel Buckingham's approval because in a prior case, a state court appointed *David*—not Daniel—as manager of Oak Plaza. (ECF No. 44, at 16).  While the court may consider prior judicial

38

proceedings in deciding a motion to dismiss, David Buckingham's argument mischaracterizes the intra-family legal matters preceding this suit, which the Appellate Court of Maryland summarized in a prior opinion involving the Buckingham Siblings. *See Tower Oaks Blvd., LLC v. Procida*, 219 Md.App. 376 (2014). In 2010, a Maryland state court did appoint David Buckingham as manager of Oak Plaza. (ECF No. 44-2, at 20-21). But that appointment was *temporary*, and it ended long before the events of this case. At the time, John Buckingham—the father of the Buckingham siblings—was nearing the end of his life. After finding that John Buckingham was "unable to manage [his] affairs," a state court appointed David Buckingham as a "temporary" guardian of his father's estate, which included the right to fill his father's role as Oak Plaza's manager. (ECF No. 44-2, at 20-21).

According to the Appellate Court, David Buckingham then sought to make this temporary authority *permanent* by trying to amend Oak Plaza's operating agreement without obtaining the consent of all his siblings. *Procida*, 219 Md.App. at 402. Because such consent was required, the Appellate Court held that this amendment was "not valid or effective." *Id.* at 404. The court also found that when the siblings' father died in 2012, David Buckingham's guardianship—and his accompanying authority over Oak Plaza—immediately ended. *Id.* at 404. From then on, David Buckingham had "no . . . authority" to "manage, control,

39

administer, and operate [Oak Plaza's] business and affairs." *Id.* at 404 (internal quotation omitted). Rather, under Oak Plaza's Operating Agreement, Daniel and Thomas Buckingham became Oak Plaza's managers when their father died. *Id.* at 404. Thus, David Buckingham is wrong to argue that his long-since-expired managerial authority granted the Defendant Siblings a right to seize the judgment funds without Daniel Buckingham's approval.

Second, Defendants argue that Tower Oaks is managed by two men named John Kenney and Howard Brown, so Daniel Buckingham did not have sole authority over the judgment funds. (ECF No. 44, at 17). Tower Oaks' original Operating Agreement—signed in 2000, apparently before the Buckingham family was involved with Tower Oaks—does list Mr. Kenney and Mr. Brown as Tower Oaks' "managers." (ECF No. 1-6, at 63, 65). But the Complaint alleges that a 2007 amendment to that Operating Agreement made John Buckingham—the siblings' father—Tower Oaks' "sole manager." (ECF No. 2, at 4). Indeed, that 2007 amendment stated that John Buckingham's management interests "succeeded" the interests of Mr. Kenney and Mr. Brown. (ECF No. 1-6, at 76). Finally, the Complaint alleges that, after John Buckingham died in 2012, Tower Oaks had no manager, which effectively gave Oak Plaza's new manager—Daniel Buckingham—full control over both LLCs. (ECF No. 2, at 4). Thus, under the facts alleged, the past involvement of Mr. Kenney and Mr. Brown is irrelevant.

40

Third, Defendants make several other arguments that either contradict the facts alleged or rely on facts outside the Complaint.  For instance, they argue that they did not have to obtain Daniel Buckingham's approval because the Complaint alleges that Daniel Buckingham "entrusted" them to handle the *Cohen* litigation.  (ECF No. 35, at 2 (Daniel Buckingham's "failure to withdraw his 'entrustment' . . . is fatal on all Counts")).  That entrustment, though, included the authority to represent Tower Oaks' "best interest[s]" in the *Cohen* litigation, (ECF No. 2, at 20)—it did not include the authority personally to seize Tower Oaks' assets.  As Oak Plaza explains in its reply brief, "Defendants were authorized to conduct the [*Cohen*] litigation," not to "cannibalize Plaintiff[']s assets as a reward for doing so."  (ECF No. 29-1, at 17).  Defendants next argue that Daniel Buckingham "abandoned his role of manager" because—they claim—he did not affirmatively do much to manage Oak Plaza. (ECF No. 35, at 19-21).  The complaint alleges, however, that Daniel Buckingham was the sole manager of Oak Plaza and that he retained that role at all relevant times.

Finally, they argue that the Defendant Siblings could decide what to do with the *Cohen* judgment because those three siblings together represent a "majority" of Oak Plaza's members.  (ECF No. 17-1, at 31 (the Defendant Siblings "are the majority members of Oak Plaza and, therefore, . . . have [the] authority" to "disburse

[Tower Oaks'] funds")).   Under the facts alleged, however, it is Oak Plaza's *manager*—not a majority of its members—that has the authority to approve distributions of Tower Oaks' assets.   Indeed, under the Oak Plaza Operating Agreement, "[t]he Manager shall have full, exclusive, and complete discretion, power, and authority . . . to manage, control, administer, and operate the business and affairs of [Oak Plaza] for all the purposes herein stated, and to make all decisions affecting such business and affairs."   (ECF No. 15-2, at 13).

### B.   Claim-Specific Arguments

#### 1.   Fraud Arguments

In Counts 5 and 9, Oak Plaza alleges that Defendants committed "fraudulent concealment" and "constructive fraud" by withdrawing the Cohen judgment funds from the state court registry and distributing those funds among themselves.   (ECF No. 2, at 19-21, 30-32).   Fraudulent concealment involves five elements: "(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."   *Lloyd v. GMC*, 397 Md. 108, 138 (2007) (internal quotation omitted).   Meanwhile, a defendant commits constructive fraud when it "breach[es] a legal or equitable duty" to the

plaintiff in a way that "tend[s] to deceive others, to violate public or private confidence, or to injure public interests." *Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 69 (2015) (internal citations omitted).  Defendants argue that (1) the Complaint does not plausibly allege facts sufficient to satisfy the "duty" and "justifiable reliance" elements of fraud, and (2) the Complaint does not plead fraud with the particularity required by Fed. R. Civ. P. 9(b).

### a.   Duty and Justifiable Reliance

Defendants argue that the complaint does not allege facts to show that Defendants owed Oak Plaza a duty.  (ECF No. 19-1, at 23).  For fraud purposes, a defendant owes a duty where "the plaintiff depends on the defendant" or where "the defendant has gained the plaintiff's confidence" and "purports to act or advise with the plaintiff's interest in mind."  *Thompson*, 443 Md. at 69 (cleaned up).  Under the facts alleged, the Defendant Siblings owed Oak Plaza a duty because Oak Plaza "entrusted Defendants . . . to act on behalf of" Tower Oaks in handling matters related to the *Cohen* case, including the "Judgment" Tower Oaks "obtained" in that case.  (ECF No. 2, at 22-23).  Mr. McNutt likewise owed a duty because he was Tower Oaks' lawyer; he represented Tower Oaks in the *Cohen* case and "with respect to various aspects of its business, including the disposition of its assets."  (ECF No. 2, at 11). *See Thompson*, 443 Md. at 69 (the "attorney-client . . .

43

relationship" is "presumed" to create a duty for fraud purposes) (internal citation omitted).

Defendants next argue that Oak Plaza did not allege plausibly that it "relied on" Defendants' "acts, statements[,] or representations," (ECF No. 17-1, at 33), and thus that the "justifiable reliance" element of fraudulent concealment is not satisfied. *Lloyd*, 397 Md. at 138. Fraudulent concealment does not require the plaintiff to rely on the defendant's affirmative acts or statements. Rather, fraudulent concealment occurs where the defendant deceptively chooses not to "disclose [a] fact," and the plaintiff "reli[es] on" that failure to disclose. *Lloyd*, 397 Md. at 138 (internal citation omitted). Thus, a plaintiff claiming fraudulent concealment may simply allege that it relied on the defendant's deceptive silence. And that is precisely what Plaintiff does: It claims that it "entrusted" Defendants to act on behalf of Tower Oaks in the *Cohen* case, that Defendants "failed to disclose" their handling of the *Cohen* judgment, and that this failure caused Oak Plaza to "rel[y] on the belief that Defendants . . . would not seek to acquire [Tower Oak's] funds." (ECF No. 2, at 20-21).

### b.   Rule 9(b)

Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Under that rule, a plaintiff pleading fraud must usually allege

"the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4ᵗʰ Cir. 1999) (internal quotation omitted). Courts recognize, however, that "[i]n cases involving alleged fraud by omission or concealment, it is well-nigh impossible for plaintiffs to plead all the necessary facts with particularity." *Corder v. Antero Res. Corp.*, 57 F.4th 384, 403 (4ᵗʰ Cir. 2023). Indeed, a plaintiff raising a fraud claim based on a mere failure to disclose cannot plead the "time, place, and content" of any affirmative false statements because that plaintiff rarely alleges that any such statements occurred. *Shaw v. Brown & Williamson Tobacco*, 973 F.Supp. 539, 552 (D.Md. 1997) ("[A]n omission cannot be described in terms of time, place, and contents of the misrepresentation."). What is more, where—as here—a plaintiff alleges that the defendant fraudulently concealed material facts, it is often difficult for that plaintiff to "obtain essential information without pretrial discovery." *Corder*, 57 F.4th at 402 (internal quotation omitted).

For these reasons, the Fourth Circuit held earlier this year that a plaintiff pleading fraud by omission or concealment is subject to a "relaxed Rule 9(b) standard." *Id.* Under this standard, a plaintiff may satisfy Rule 9(b) by alleging a "starting point" at which the fraud began and by providing a "date . . .

through [which]" the fraud continued, as long as those allegations suffice to make the defendant "aware of the particular circumstances for which [it] will have to prepare a defense at trial." *Id.* at 402-403 (quoting *Edmonson*, 922 F.3d at 553) (alterations in original).

The Complaint satisfies this relaxed standard in pleading the non-time-barred claims. The Complaint alleges that "[o]n or about February 14, 2017," the Defendant Siblings and Mr. McNutt signed an agreement to escrow the *Cohen* judgment funds. (ECF No. 2, at 6). Then, on "March 6, 2017," Mr. McNutt withdrew those funds from the court registry and moved them to a private bank account. (ECF No. 2, at 6-7). Finally, Mr. McNutt "disbursed those funds" among the Defendant Siblings and his law firm, in transactions that occurred on "March 14, 2017, April 16, 2017, and January 16, 2019." (ECF No. 2, at 7). Those allegations provide a "starting point" (February 14, 2017—the date the escrow agreement was signed), and a "date . . . through [which]" the fraud continued (January 16, 2019—the date of the last disbursement). *See Corder*, 57 F.4th at 403. Because the Complaint makes Defendants "aware of the particular circumstances for which [they] will have to prepare a defense at trial," Rule 9(b)'s "relaxed standard" is satisfied. *Id.*

Resisting this outcome, Defendants argue that the Complaint does not allege the specific date on which Oak Plaza "entrusted"

Defendants to handle the *Cohen* case.   (ECF No. 19-1, at 13-14).
But that is not dispositive.   The Complaint alleges that Oak
Plaza's trust in Defendants existed when Tower Oaks "obtained the
[*Cohen*] [j]udgment" in 2014 and remained unbroken until the
auditor's report uncovered the disbursements in 2020.   (ECF No. 2,
at 4, 5, 7, 20).   Defendants cite no authority to support their
argument that Rule 9(b) requires a plaintiff to be any more
specific than that.   Indeed, several courts in this circuit have
held that a plaintiff claiming fraud by omission satisfies Rule
9(b) in part by alleging "the *general time period* over which the
relationship [giving rise to the defendant's duty] arose." *Breeden
v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 194 (M.D.N.C. 1997)
(emphasis added).[19]   Plaintiff has done so.

Defendants also assert that nearly a dozen other facts in the
complaint are not plead with particularity.   (*See* ECF Nos. 19-1,
at 12-18).   Their assertions on this score are unpersuasive for
three reasons.

First, they argue that the Complaint is missing some details
that are not actually missing at all.   For instance, they assert
that Plaintiff does not allege when or how Daniel Buckingham became
its manager, but the Complaint alleges that he became manager "[o]n

---

[19] *See also Nakell v. Liner Yankelevitz Sunshine &
Regenstreif, LLP*, 394 F.Supp.2d 762, 767 (M.D.N.C. 2005) (same);
*Sadler v. Pella Corp.*, 146 F.Supp.3d 734, 747 (D.S.C. 2015) (same).

October 17, 2012," when his father died.  (ECF No. 2, at 4).  They also argue that Oak Plaza does not allege "when and where" the Defendants "opened a bank account," (ECF No. 19-1, at 17), but the Complaint alleges that Defendant McNutt "opened a bank account" between "March 6, 2017" and "March 14, 2017."  (ECF No. 2, at 6-7).  And the attached auditor's report states that the account was opened "in Virginia."  (ECF No. 1-6, at 43).  Defendants also argue that Oak Plaza does not allege "when" or "where" the Defendants "acted in concert," (ECF Nos. 19-1, at 14-15; 17-1, at 15-16), but the Complaint alleges that the Defendants conspired in early 2017 to withdraw funds from the court registry in "Montgomery County, Maryland," (ECF No. 2, at 6), and to take those funds to a Virginia bank account,  (ECF No. 1-6, at 43).

Second, Defendants argue that the Complaint is missing details that are irrelevant to Oak Plaza's fraud claims.  They assert, for example, that Oak Plaza does not allege "a date, place, time, location, or a description" of how the Defendant Siblings' authority in the *Cohen* case "was terminated."  (ECF No. 19-1, at 14).  But Oak Plaza alleges that Defendants' authority over the *Cohen* litigation *never* included the power to take for themselves the judgment funds—thus, it does not matter when, how, or where that authority ended.  Defendants also assert that the Complaint does not "provide a date, place, time, location, or a description" of any "false representations" made by Defendants.  (ECF No. 19-

1, at 12).  But Oak Plaza's fraud claims rest on the Defendants' *failure to disclose* their actions—not on affirmative false statements.

Third, Defendants argue that the Complaint is missing details that Rule 9(b) seemingly does not require a plaintiff to allege. For instance, they assert that the complaint does not allege "how" or "where" the disbursements to the Defendants "were made."  (ECF No. 19-1, at 17).  True, the complaint does not allege the precise method of payment used for those disbursements—it does not, for example, state whether the payments were made by wire transfer, check, or cash withdrawal.  Defendants cite no authority to suggest that Rule 9(b) requires such detail.  The Complaint already alleges the dates of the disbursements, the state in which the funds were kept, and the parties involved.  That is more than enough to make Defendants "aware of the particular circumstances for which [they] will have to prepare a defense at trial."  *Corder*, 57 F.4th at 403.

Finally, Defendants note that several facts alleged in the Complaint are based on "information and belief," and argue that under Rule 9(b), a "[p]leading[] alleging fraud usually may not be based on information and belief."  (ECF No. 44, at 13 (internal quotation omitted)).  On this score, the "relaxed Rule 9(b) standard" that applies makes the difference as well.  *Corder*, 57 F.4th at 402.  Under that standard, a plaintiff "alleging fraud by

49

omission or concealment" may "rely on information and belief without running afoul of Rule 9(b)," as long as the complaint "state[s] the factual allegations that make [the plaintiff's] belief plausible." *Id.*

The Complaint relies on "information and belief" to support only a handful of allegations.  And only one such allegation is relevant to the non-time-barred fraud claims: "Upon information and belief, the Defendants divided th[e] funds [withdrawn from the court registry] amongst themselves." (ECF No. 2, at 5).  It is unclear why Plaintiff relied on information and belief to make this allegation, but the Complaint includes several "factual allegations that make [this] belief plausible." *Corder*, 57 F.4th at 402.  The Complaint alleges that Defendant McNutt withdrew funds from the court registry, that he deposited those funds into a bank account, and that each Defendant received disbursements from that account—eventually leaving the account empty. (ECF No. 2, at 6-7).  Based on those allegations, Plaintiff's belief that Defendants "divided th[e] funds amongst themselves" is plausible. (ECF No. 2, at 5).[20]

---

[20]  Defendants also note that the Complaint relies on "information and belief" to allege that Daniel Buckingham did not authorize the 2015 assignments filed in the *Cohen* case docket. (ECF No. 19-1, at 18).  The court need not address this issue because that allegation relates only to the time-barred assignment claims.

### 2.   Conspiracy Arguments

In Count 6, Oak Plaza alleges that Defendants engaged in a conspiracy to commit fraudulent concealment.   (ECF No. 2, at 21). To state a conspiracy claim, a plaintiff must plausibly allege three elements: (1) a "confederation of two or more persons by agreement or understanding," (2) "some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal," and (3) "[a]ctual legal damage resulting to the plaintiff."   *Lloyd*, 397 Md. at 154 (internal quotation omitted).

Defendants assert that "[n]one of the acts complained of are unlawful," (ECF No. 17-1, at 33), and argue that Oak Plaza has thus not alleged facts sufficient to satisfy the second element, which requires an "unlawful or tortious act done in furtherance of the conspiracy."   *Lloyd*, 397 Md. at 154.   To the contrary, the Complaint alleges that Defendants engaged in multiple unlawful acts to further their conspiracy.   Indeed, Oak Plaza claims that Defendants (1) withdrew from a court registry money that they knew was not theirs, (2) moved that money to an out-of-state bank account, and (3) distributed that money among themselves—all while knowing that they lacked permission to do any of these things. Defendants do not explain why these allegations do not include the kinds of unlawful acts necessary to state a conspiracy claim.

Defendants also invoke the "Intracorporate Conspiracy Doctrine." (ECF No. 35, at 22). Under that doctrine, "corporate employees cannot conspire with each other" because each employee's acts are legally considered "acts of the corporation itself." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002). Thus, because conspiracy requires collaboration by "two . . . or . . . [more] entities," and a corporation "cannot conspire with itself," cooperative acts by multiple corporate agents usually cannot establish a conspiracy claim. *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985) (internal citation omitted). In relying on this doctrine, Defendants seem to argue that they could not have conspired with each other because they are all agents of either Tower Oaks or Oak Plaza.

There is an "important exception[]" to the intracorporate conspiracy doctrine. *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 353 (4th Cir. 2013). A plaintiff "may state a conspiracy claim" against corporate agents where the agents' acts "were not authorized by the corporation." *Id.* That is precisely what Plaintiff alleges here. Indeed, the very core of its claim is that Defendants' dissipation of the judgment funds was "[u]nauthorized." (ECF No. 2, at 5).

### 3. Unjust Enrichment Arguments

In Count I, Oak Plaza raises an unjust enrichment claim. Under Maryland law, unjust enrichment includes three elements: (1)

a "benefit conferred upon the defendant by the plaintiff," (2) an "appreciation or knowledge by the defendant of the benefit," and (3) the "acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151-152 (2000) (internal citation omitted).

Defendants argue that Plaintiff failed to state an unjust enrichment claim because the Defendant Siblings purportedly spent much of their personal time and money managing the *Cohen* case, and thus they claim it was not "unjust" for them to "compensat[e]" themselves using the judgment funds. (ECF No. 19-1, at 26). This argument relies on facts not alleged. At later stages in this case, Defendants may introduce evidence of their purported personal expenses, but those expenses cannot be the basis for a motion to dismiss.[21]

Defendants also argue that the unjust enrichment claim rests on the allegation that Defendants "refused to refund the money they received from the judgment in the *Cohen* lawsuit," which they argue is a "bald assertion" that is insufficiently plead under

---

[21] Defendants argue that because the 2015 assignment documents state that the assignments were being made "[f]or value received," (ECF No. 1-6, at 89-91), the assignments cannot be unjust enrichment. (ECF No. 44, at 18-20). The court need not address that argument because the claims related to the 2015 assignments are time-barred.

Rule 8.  (ECF Nos. 19-1, at 15).  While the court need not accept as true "legal conclusions" or "[t]hreadbare recitals of the elements," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), Defendants do not explain why they believe this allegation fits one of those categories.  Indeed, the challenged allegation seems to be a plain statement of the purported fact that Defendants refused to return the judgment funds they allegedly took.  Such a "nonconclusory factual allegation" is exactly the kind of statement this court must accept as true at this stage.  *Iqbal*, 556 U.S. at 680.[22]

### 4.   Malpractice Arguments

In  Count  II,  Plaintiff  alleges  that  Defendant  McNutt committed  legal  malpractice.   To  state  a  claim  for  legal malpractice, a plaintiff who is a "former client" of the defendant attorney must allege: "(1)  the  attorney's  employment,  (2)  the attorney's neglect of a reasonable duty, and (3) loss to the client proximately caused by that neglect of duty."  *Suder v. Whiteford, Taylor & Preston, LLP*, 413 Md. 230, 239 (2010) (internal citation omitted).

---

[22] Defendant McNutt also argues that Count I of the Complaint insufficiently pleads that he "accepted the . . . disbursements." (ECF No. 35, at 8).  It is unclear what statement in the Complaint to which Mr. McNutt is referring—Count I does not allege that Mr. McNutt "accepted" the disbursements; it alleges that, "at the direction of and in concert with [the Defendant Siblings]," Mr. McNutt "disbursed all funds" from the *Cohen* judgment.  (ECF No. 2, at 8).  That is a nonconclusory factual allegation that this court must take as true.

Mr. McNutt argues that the first element—"employment"—is not satisfied because he has never been employed by Daniel Buckingham, Thomas Buckingham, or the Receiver.   (ECF No. 35, at 11 ("[T]his Defendant never had an attorney-client relationship with Daniel or Thomas or the Receiver. Therefore, this Defendant could not have committed malpractice.   Employment is an essential element of a malpractice claim.")).   The employment element is satisfied where the defendant attorney represented the plaintiff claiming malpractice. *Suder*, 413 Md. at 239.   Here, that plaintiff is neither Daniel Buckingham nor Thomas Buckingham nor the Receiver. Rather, it is Oak Plaza, suing on behalf of Tower Oaks.   The Complaint alleges that Mr. McNutt represented Tower Oaks—and he himself admits that he has represented both Tower Oaks and Oak Plaza in the past. (ECF No. 17-1, at 30).   Thus, the Complaint sufficiently alleges the employment element.

He next argues that he cannot be liable for malpractice because he represented Oak Plaza in the state court dissolution suit.  Mr. McNutt believes that he is improperly being sued here by the parties that "oppos[ed]" his client in the dissolution suit— namely, "Daniel and Thomas"—and that those parties are suing him simply because he "defend[ed] the [dissolution] action." (ECF No. 17-1, at 30).  This argument is mistaken for two reasons.  First, Mr. McNutt is not being sued by Daniel and Thomas Buckingham—once again, the plaintiff here is Oak Plaza, suing on behalf of Tower

Oaks.   Daniel and Thomas Buckingham are not parties.   Thus, far from being sued by the parties that opposed his client in the dissolution suit, Mr. McNutt is being sued by the party he *represented* in that suit: Oak Plaza.   And a "former client" is precisely the kind of plaintiff that sues for legal malpractice.   *Suder*, 413 Md. at 239.   Second, Mr. McNutt is not being sued "for defending the [dissolution] action" on Oak Plaza's behalf.   (ECF No. 17-1, at 30).   He is being sued because he allegedly helped the Defendant Siblings fraudulently to obtain the *Cohen* judgment.

Finally, Mr. McNutt argues that he cannot be liable for malpractice because he was acting at the behest of the Defendant Siblings, who represent a numerical "majority" of Oak Plaza's members, and that he was not "aware of Daniel's apparent authority" over Oak Plaza.   (ECF No. 17-1, at 24, 30).   The Complaint alleges that any disbursement of Tower Oaks' assets had to be approved by Oak Plaza's *manager*, Daniel, not a majority of its members.   It likewise alleges that Mr. McNutt "knew that [the Defendant Siblings] did not have the authority to act on behalf of [Tower Oaks]," and that he "knew" he was "dece[iving]" Tower Oaks by not disclosing the disbursements to Daniel.   (ECF No. 2, at 34).   Thus, Mr. McNutt's assertion that he acted on the Defendant Siblings' orders cuts *against* dismissal, not in favor of it.   Given the knowledge he was alleged to have, Mr. McNutt had a duty to refuse to help the Defendant Siblings in carrying out their purported

56

scheme.  By alleging that Mr. McNutt instead actively participated in that scheme, Oak Plaza has stated a claim for malpractice.

## IV.  Conclusion

Defendants' motions to dismiss will be granted in part and denied in part.  A separate order will follow.


                                        /s/
                              _____
                              DEBORAH K. CHASANOW
                              United States District Judge